CHERYL BOWDEN-WALKER

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CHERYL BOWDEN-WALKER                                    PLAINTIFF

VS.                        CIVIL ACTION NO. : 3:14cv917-CWR-FKB

WAL-MART STORES EAST, LP                                DEFENDANT




DEPOSITION OF CHERYL BOWDEN-WALKER

taken on Wednesday, October 21st, 2015,
commencing at approximately 11:00 a.m.
at the River Hills Club
3600 Ridgewood Drive
Jackson, Mississippi




REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
LOGAN REPORTING
106 Park Lane
Brandon, MS 39047
(601) 622-7622
loganreporting@gmail.com

**EXHIBIT**
tabbies
1

LOGAN REPORTING
601-622-7622



CHERYL BOWDEN-WALKER

1                    CHERYL BOWDEN-WALKER

2       after having been first duly sworn, was examined and

3    testified as follows:

4                         EXAMINATION

5    BY MR. CUPP:

6       Q.   Good morning, Ms. Walker.   My name is Steve

7    Cupp.   I represent Walmart in this case that you have

8    filed against the company.   We have had a chance to meet

9    briefly off the record just now, correct?

10      A.   Just now, yes.

11      Q.   We are on the record now.

12      A.   Okay, yes, correct.

13      Q.   And this is, of course, the first time we have

14   met.   Have you ever had your deposition taken before?

15      A.   I have.

16      Q.   When was that?

17      A.   I believe it was about -- I can't tell you the

18   year.   I know it was anywhere between 2003 and 2005,

19   between that time frame.

20      Q.   What kind of case was that?

21      A.   It was a worker's comp claim.

22      Q.   Were you working for Walmart at the time?

23      A.   No, sir.

24      Q.   When did you begin working at Walmart?

25      A.   March of 2012.

CHERYL BOWDEN-WALKER

1      Q.   And you were discharged, if I'm not mistaken,

2   December 23rd, 2013?

3      A.   Yes, sir.

4      Q.   We're going to talk about that obviously a

5   little bit more in detail as we go along, but I just

6   wanted to get those dates correct.  When you were hired

7   with Walmart, what position were you hired into?

8      A.   Asset protection manager.

9      Q.   Was that at store 903?

10      A.   That's correct.

11      Q.   I know at the time that Eddie Robinson was the

12   store manager; is that correct?

13      A.   That's correct.

14      Q.   And who was your MAPM?

15      A.   We had two.  I started out with a Ms. Angie

16   Randall, and -- I'm trying to remember the gentleman's

17   name.

18      Q.   It was a gentleman?

19      A.   Yes.  It was a man when I left.

20      Q.   So Angie left sometime during the time that you

21   were there?

22      A.   She took a different position, actually, to

23   store 903 as a co-manager.

24      Q.   And I believe you are -- Well, for purposes of

25   the record, let's just make it clear.  A MAPM - and

CHERYL BOWDEN-WALKER

1      A.    No.

2      Q.    So you have produced everything that you

3   recorded?

4      A.    Yes, sir.

5      Q.    And I listened to that.  I think it's close to

6   two hours, by the time you go all through everything, or

7   an hour and 45.  Have you listened to it recently?

8      A.    Not recently, but I have reviewed it.

9      Q.    Now, you started in March 2012, and you were

10   the asset protection manager?

11      A.    Yes.

12      Q.    And then I know you went to another store as an

13   assistant manager?

14      A.    Yes, sir, I was promoted.

15      Q.    And that was in March of 2013?

16      A.    Correct.

17      Q.    I think Walmart has sort of the standard one

18   year in the position before you can move on; is that

19   correct?

20      A.    That's correct.

21      Q.    So in March of 2013, you went as an assistant

22   manager where?

23      A.    At the store 365 in Pearl, Mississippi.

24      Q.    And when you got there, Luke Gleason was your

25   manager, correct?

CHERYL BOWDEN-WALKER

1    that you testified about earlier, have you ever been a

2    plaintiff in a lawsuit?

3        A.    No.

4        Q.    And I'm not talking about, of course, in the

5    domestic stuff like divorces or whatnot because you

6    always have a plaintiff and a defendant there.

7        A.    Right.

8        Q.    But have you ever sued an employer before?

9        A.    No, not other than the worker's comp for the

10   company that I did back then.

11       Q.    What is the name of that company?  Who is that?

12       A.    Is it okay to divulge that?

13       Q.    Just for --

14             MR. CUPP:  Nick, I don't think there's a

15   problem naming the defendant in the worker's comp case

16   that she sued.  It was so long ago, it's not going to

17   make a difference.

18       A.    Okay, it was the YMCA.

19   BY MR. CUPP:

20       Q.    I was thinking that could have been it because

21   I knew you worked at the YMCA.

22       A.    Uh-huh.

23       Q.    In this case, Ms. Walker, you are suing Walmart

24   for violations of the Americans with Disabilities Act;

25   is that correct?

CHERYL BOWDEN-WALKER

Page 25

1      A.    That's correct.

2      Q.    And what specifically do you allege against

3   Walmart in that regard?

4      A.    That they did not meet my accommodations, and

5   they forced me to work against the accommodations that

6   were set forth.  And I don't believe that they took to

7   do due diligence in facilitating getting my

8   accommodations in place prior, you know, to putting me

9   back to work at that capacity.

10     Q.    And you are alleging against the company

11   retaliation under the Family and Medical Leave Act?

12     A.    I'm not sure about retaliation against the

13   Family and Medical Leave Act because FMLA was granted,

14   and I had no problems with FMLA.

15     Q.    And, again, I know your attorneys put these

16   together, but do you allege that Walmart terminated you

17   in retaliation for you taking leave?

18     A.    The best way to -- I don't know how to answer

19   that.  Can you restate it?

20     Q.    Yes.  Are you alleging against Walmart that one

21   of the reasons Walmart wanted to discharge you is

22   because you took that leave of absence?

23     A.    I believe that Walmart wanted to get rid of me

24   because I had that accommodation in place.

25     Q.    Did anybody ever tell you that they were upset

CHERYL BOWDEN-WALKER

Page 27

1    correct?

2        A.   Yes, sir.

3        Q.   And it looks like that Walmart -- This

4    particular form is dated October 1st, 2013?

5        A.   That's correct.

6        Q.   But it looks like you started your leave

7    several weeks before as of September 14, 2013?

8        A.   That's correct.

9        Q.   So you requested it, and then it took a little

10   bit of time to get all the paperwork together?

11       A.   That's correct.

12       Q.   So when you received this form from Walmart,

13   you understood that Walmart was granting you family and

14   medical leave; is that correct?

15       A.   That's correct.

16       Q.   It's stated that it started as of September

17   14th, 2013, if you kind of look at the box down below?

18       A.   Yes.

19       Q.   And it was going to end on 12-19-2013?

20       A.   Yes, sir.

21       Q.   Now, I saw some other documentation in the file

22   where actually the FMLA only extended through December

23   9th, 2013.

24       A.   I saw that.  Now, that's where I said that that

25   was a little different than what was submitted here.  I

CHERYL BOWDEN-WALKER

1   did receive a letter from HR that said that they could

2   post my position because I wasn't there, but I had this

3   document saying that I could return when I returned.

4   And I don't know if you have a copy, but I do.

5        Q.   Yes, I do, and I was a little confused about

6   that as well because I wasn't sure whether the

7   additional 10 days was under some sort of other leave

8   that you may have had.

9        A.   And to be honest, the dates that were here was

10  going with my preschedule of when I was supposed to

11  work.  And, actually, the 19th was actually the date

12  that I was supposed to -- it was a working shift, not an

13  off shift.

14       And if you'll see here, it's just showing that the

15  16th through the 18th would have been unpaid, but all

16  the way through the 15th was paid.  So, again, when I

17  received that letter, I was concerned.  And I did call

18  and was really pushing to get back to work, so that I

19  could maintain a position.

20       Q.   And it did get worked out; is that correct?

21       A.   Yes.  I did return to work.

22       Q.   And you had to leave through the 19th?

23       A.   Well, I returned on the 19th, but I was sent

24  home on the 20th.

25       Q.   I understand that.  So you did return on the

CHERYL BOWDEN-WALKER

1    19th?

2        A.    I did.

3        Q.    So there was no problem with your leave from

4    the time you took it until the time you came back?

5        A.    No.   I was able to return on the 19th.

6        Q.    And did anyone at any point express any concern

7    with you being out during that time?

8        A.    Not that I recall.

9        Q.    So as you sit here today, do you believe that

10   Walmart as a company or the managers at that store were

11   okay with you taking that leave?

12       A.    I believe that they were fine with me taking

13   the leave, yes.

14       Q.    So that turns us to the accommodation issue.

15   That's where you think they had a rub, as far as

16   providing you an accommodation; is that correct?

17       A.    Yes, sir.

18       Q.    Now, who do you believe had the problem with

19   the accommodation?

20       A.    Luke Gleason is the first who expressed actual

21   words in terms of my accommodation.

22       Q.    Tell me what he told you about that.

23       A.    He said that I was treading uncharted waters

24   with getting that accommodation; no one has ever done

25   that before.   And he also said that he felt like the

CHERYL BOWDEN-WALKER

1    morale of my team members would go down.

2        Q.   When did he tell you that?

3        A.   Upon my return.

4        Q.   On the 19th or the 20th?

5        A.   I believe it was the 20th when we actually had

6    a discussion about it because I asked again could I use

7    a cart when I told him that I was hurting.

8        Q.   And that would have been December 20th?

9        A.   Yes.

10       Q.   Did you work on December 19th?

11       A.   I did.

12       Q.   Do you recall what shift you were working at

13   that time?

14       A.   I worked -- I was scheduled to work from 8:00

15   to 6:00, if I'm not mistaken.  And I actually had an

16   email where I put my shift in to Regina, and it actually

17   said the actual time.  But I worked the morning shift,

18   but then once someone else called in, I was asked to

19   work additional hours because another manager was out.

20   So I ended up working from the morning until 10:00 p.m.

21   on the 19th.

22       Q.   Now, did you have any discussions with Luke

23   about your accommodation on the 19th?

24       A.   Yes.  When I came in, I actually reported to

25   the HR office.  And I brought my copies of paperwork,

1    even though I knew that they had them.  But I still

2    brought my copies in to show that I was supposed to have

3    the cart in place.

4        And, actually, I made a phone call to our

5    accommodations center, and they said that we had a

6    scooter at the store.  And when I went there, they said,

7    "We haven't heard anything.  We don't have that here."

8        So at that time, I asked Luke if I could do my

9    administrative duties until we get that in, since I had

10    been gone for three months, like the payroll and just

11    look at my reports and do those things and do my

12    supervisory stuff.  And he told me, "No, there's no

13    administrative.  You have to work freight.  We're

14    getting freight to the floor, freight to the floor."

15    Q.   It was the holiday season?

16    A.   Right.  And that's why.

17    Q.   Was that on the 19th?

18    A.   That was on the 19th.  And I even asked him

19    could I use the store carts since they didn't have the

20    scooter in place, and he said that was for the customers

21    and I couldn't use them.

22    Q.   So the 19th was the day that you came back, the

23    accommodation that the company said they would provide

24    to you wasn't in place, and you worked that day and

25    basically worked a double shift?

1     A.    Pretty much.

2     Q.    Which assistant manager called in on the 19th?

3  That was pretty brave of them.

4     A.    I don't remember her name.

5     Q.    Okay.  I'm just curious.

6     A.    But one of the co-managers asked me to stay.

7  Luke was already gone, but one of the co-managers asked

8  me to stay.

9     Q.    And I said that in jest a minute ago, but you

10  understand that the --

11     A.    You know Walmart.

12     Q.    Yes, I know Walmart, and they can't sell the

13  goods unless it's on the floor, right?

14     A.    Yes, sir.

15     Q.    So there's a push, and it's kind of "all hands

16  on deck" for that?

17     A.    Uh-huh.

18     Q.    Answer out loud yes or no.  I'm sorry.

19  Sometimes we get in a tendency to shake our heads.

20     A.    Yes, sir.

21     Q.    Okay.  I felt like you would agree with me on

22  that.

23     A.    Yes, sir.

24     Q.    And I understand that they didn't have your

25  accommodation available, but did you understand what the

CHERYL BOWDEN-WALKER

Page 33

1    co-manager was saying about what they needed at that

2    time?

3        A.    I understood what his direction was, but I also

4    know that we have staff in place that could have done

5    freight.

6        Q.    Were the other assistant managers who were

7    working on that day doing freight?

8        A.    I'm not sure what they were doing with their

9    department.  My department was electronics and toys.

10   And, of course, with it being Christmas, he wanted me

11   working toys.

12       Q.    So you kind of got the double whammy there with

13   the big department for its gifts?

14       A.    Yes, sir.

15       Q.    Let's go back a second.  And I think just for a

16   matter of housekeeping, I want to put some documents

17   into the record for your FMLA claim.

18       A.    Okay.

19            (Exhibit 2 marked for identification.)

20   BY MR. CUPP:

21       Q.    I've marked this as Deposition Exhibit Number

22   2, and this appears to be the letter that you received

23   from Walmart on December 17th saying that, according to

24   the records, your FMLA leave expired on December 9th.

25       A.    Uh-huh.

CHERYL BOWDEN-WALKER

Page 36

1      Q.    And is it your belief that Walmart complied

2   with their policy for your FMLA leave?

3      A.    I do.

4      Q.    When were you told that you were going to have

5   a meeting with Ms. Barnes and Ms. Hosey?

6      A.    Friday when I was asked to leave the building.

7   I was asked to leave, and when I questioned Luke about

8   it and who made the decision, he said that Regina Hosey,

9   the market human resource manager, made that call.

10     So I called her.  And when I spoke with her, and I

11   even asked to do my jobs, some of the other jobs that I

12   have in terms of the supervisory, or I even asked for a

13   TAD, which is the temporary alternative duty, and I

14   asked her specifically can I just greet customers or

15   answer phones, and she told me that I had to leave the

16   property immediately, and that we would meet on Monday.

17     Q.    So you had that conversation on December 20th?

18     A.    Yes.

19     Q.    Now, had you gotten into your shift that day?

20     A.    Yes, the shift had already started.  I came in

21   with Luke sending all managers to the garden center

22   because overnight they had left freight in there, and so

23   we had to work the freight aisle.  And I was in there

24   with them working the freight.

25     And after we had worked freight, we had our

CHERYL BOWDEN-WALKER

1   administrative team meeting.  And at that meeting, I

2   guess he noticed pain in my face or something.  So after

3   the meeting, he pulled me to the side and asked me how I

4   was doing.  And that's when I told him I was hurting,

5   you know.

6        And then I asked could I use the cart, and that's

7   when that conversation took place that I spoke of

8   earlier.  And then we went away, I went back to actually

9   do my own meeting with my own group from electronics.

10  And then I got called from that meeting back by Luke

11  Gleason, who told me at that time that I must leave the

12  premises.

13       Q.   So did Luke tell you he had called somebody and

14  gotten that instruction?

15       A.   That's what he told me, once he called me back

16  in.  So apparently after we met and I told him that I

17  was hurting, apparently he went in and spoke with the

18  HR.

19       Q.   I thought that the conversation you had with

20  him about using the cart was on the 19th?

21       A.   Well, on the 19th, that was me coming back and

22  I asked for the cart.  On the 20th I asked again, since

23  we didn't have anything in place.  And pretty much I was

24  at the point of, if I need to work on the floor, I need

25  something for help.

CHERYL BOWDEN-WALKER

Page 38

1      Q.   And I understand that you did go home that day

2  on the 20th?

3      A.   I did.

4      Q.   And how many hours do you think you worked on

5  the 20th?

6      A.   I'm not actually sure because when I went home

7  -- now, if we can reference the email, maybe it can give

8  me a point of reference.  If you don't have it, I have a

9  copy.

10     Q.   I think I do.  We may get to it in a minute.

11     A.   Okay.

12     Q.   But you did work some period of time?

13     A.   I did work the morning, yes.

14     Q.   And then you were told to go home?

15     A.   Yes.

16     Q.   And, of course, you sent an email because you

17 were concerned that this was going to financially impact

18 you?

19     A.   Yes because I had no more leave.  And, of

20 course, if you will refer back to Exhibit 1, it said

21 that I was unpaid as of the 16th and the 18th.  So

22 anything else -- if I wasn't working, I didn't think I

23 would get paid for it.

24     Q.   But you did get paid for that Friday?

25     A.   They ended up paying me, yes.

CHERYL BOWDEN-WALKER

1     A.    Because I didn't want anybody to say something

2  and then not do it.

3     Q.    And in that meeting, what I heard from the

4  recording is that they told you, at least in the first

5  part of the meeting, that they were getting the scooter,

6  or that the scooter was put on order?

7     A.    Correct.

8     Q.    Now, the second part of that meeting, as I

9  understood it, is when Regina Barnes took over; is that

10 correct?

11    A.    Correct.

12    Q.    And that's when she went back over some of the

13 Sean Copeland issues; is that correct?

14    A.    That's correct.

15    Q.    Now, I think you indicated earlier that that's

16 the only recording that you have?

17    A.    That's correct.

18    Q.    I think there were a total of six recordings

19 that we got out of the Sean Copeland EEOC file.  Did you

20 listen to all of them?

21    A.    I did.  But in terms of listening, it actually

22 looked like some of it was a part of the same day type

23 of thing, yeah.

24    Q.    All right.  There are two that I'm going to

25 focus on.

CHERYL BOWDEN-WALKER

Page 41

1      A.   Okay.

2      Q.   There was one disc, and I have it in here --

3   Well, let me back up.  Did you listen to all of them?

4      A.   I did.

5      Q.   Do you dispute that on all those tapes, that is

6   you, that is your voice?

7      A.   It is my voice.

8      Q.   So we don't have any dispute there?

9      A.   No dispute.

10     Q.   Do you believe that any of the tapes were

11  spliced together to make it sound like you said

12  something that you actually didn't say?

13     A.   On one at the beginning where it seemed like he

14  audio recorded a date, and once I listened to that same

15  audio recording, it wasn't that date.  So I do feel like

16  that there was some altering done.

17     Q.   All right.  On one tape that I'm focusing on --

18  And let me see if it's labeled here.  We're not going to

19  listen to them.  I don't think there is a need to,

20  unless you want to.

21     A.   Okay.

22     Q.   The one that I'm referring to first is

23  referenced as "Recording from digital recorder folder

24  B."  On the bottom of it, it has, "Content general

25  office discussion."  And that's just for reference,

CHERYL BOWDEN-WALKER

Page 42

1    okay?

2        A.    Okay.

3        Q.    And these are the same ones that we provided to

4    Nick.  Now, are you aware of how Walmart came into

5    possession of these audio recordings?

6        A.    Yes.  Through EEOC.

7        Q.    So you understand that when Mr. Copeland

8    resigned -- I think he turned in his letter of

9    resignation to you?

10       A.    No, he didn't.

11       Q.    Who did he turning that in to?

12       A.    As far as my knowledge goes, because I don't

13   know since he didn't turn it in to me, I believe he

14   turned it in to the human resource manager at the store

15   where Eddie Robinson works.

16       Q.    Was it the personnel manager?

17       A.    I think it was.  If I'm not mistaken, it's

18   Carlotta.  I can't think of her last name.

19       Q.    Yes, I know Carlotta.  I can't think of her

20   last name either.

21       A.    Okay.

22       Q.    And he alleged that he resigned because he felt

23   like he was being sexually harassed?

24       A.    I don't think those were the words that were

25   used because at first we had no idea who he was talking

1    about.

2        Q.    But at some point, you were told that he had

3    filed a sexual harassment charge with the EEOC alleging

4    that you had engaged in improper conduct?

5        A.    No.  My knowledge of it being an EEOC case came

6    later with Regina.

7        Q.    But you did participate in the red book

8    investigation that took place?

9        A.    There was a red book investigation that took

10   place over the summer, yes.

11       Q.    And did anybody explain to you that

12   Mr. Copeland had made these allegations against you?

13       A.    That was revealed to me then over the summer,

14   yes.

15       Q.    And I believe you provided a written statement

16   during that red book investigation.  Do you recall that?

17       A.    I was out of town when we had the interview

18   with myself, Rafael Brown, Ed Robinson, and the then

19   store -- he was the level above -- the market --

20       Q.    Glyn Booth?

21       A.    Glyn, yes.  We did a phone interview.  And when

22   I returned, Rafael asked me to write a statement.

23       Q.    I want to put in front of you what we're

24   marking as Deposition Exhibit 5.

25            (Exhibit 5 marked for identification.)

CHERYL BOWDEN-WALKER

Page 44

1    BY MR. CUPP:

2        Q.   So initially when you were interviewed, it was

3    over the phone?

4        A.   My initial interview, yes, because I was in

5    Louisiana in training.

6        Q.   And what I put in front of you that's marked as

7    Deposition Exhibit 5 is your handwritten statement; is

8    that correct?

9        A.   This is my handwriting.

10       Q.   And if you turn to the back page, I just want

11   to make sure that's your signature, correct?

12       A.   This is my signature, yes.

13       Q.   And it's dated June 10th, 2013?

14       A.   Yes.

15       Q.   Now, when you provided this, were you actually

16   at the store in Pearl?

17       A.   I was at the store in Pearl when I wrote this,

18   yes.

19       Q.   Who was with you at the time?

20       A.   I don't believe anyone was with me.  I was just

21   sitting in an office writing.

22       Q.   Well, did someone refresh you on what the

23   allegations were that were made about you?

24       A.   No.

25       Q.   It was just Rafael had asked you to do it?

CHERYL BOWDEN-WALKER

1       A.    He just asked me to write a statement, and

2   that's what I did.

3             MR. CUPP:  Let's go off the record a second.

4             (A short break was taken off the record at

5   12:03 p.m.)

6             (Deposition resumed on the record at

7   12:05 p.m.)

8   BY MR. CUPP:

9       Q.    Okay, we took a short break off the record so

10  Ms. Walker could read her June 10th, 2013, statement.

11  Which you did, correct, ma'am?

12      A.    Yes.

13      Q.    Now, is everything in this statement accurate?

14      A.    It was accurate at the time of when I came back

15  and I put the statement in place.  And it was based on

16  all of the questions that were asked of me at the time.

17      Q.    But I thought you said no one was there at the

18  time?

19      A.    No, that was asked of me from our interview

20  over the phone.  I just had to recall what was asked.

21      Q.    I don't know the timing here.  Between the time

22  that you were interviewed over the phone and the time

23  that you wrote the statement, how long did that take?

24      A.    I'm not sure because I really don't remember

25  when they called and where I was with training at the

CHERYL BOWDEN-WALKER

Page 46

1    time.

2         Q.   I have the various red book investigations.

3         A.   Okay.

4         Q.   And I know you can't authenticate this because

5    this is not your handwriting?

6         A.   That's correct.

7         Q.   And we'll go ahead and mark this as Deposition

8    Exhibit 6.

9              (Exhibit 6 marked for identification.)

10   BY MR. CUPP:

11        Q.   It appears that there was an interview of you

12   by Glyn Booth, witnessed over the phone by Eddie

13   Robinson, on May 15th, 2013?

14        A.   May 15th?

15        Q.   I want to give you this, and you can look at

16   it.

17        A.   Okay.

18        Q.   I think this also has other --

19        A.   Statements from other people?

20        Q.   Yes.  And I just attached them.  I did

21   something that wasn't necessary.  I think I just stapled

22   them together for my convenience.

23        A.   That's fine.

24        Q.   But we'll take -- Primarily I want you to

25   concentrate on just the date.  And that appears to be a

CHERYL BOWDEN-WALKER

1    part of Walmart's normal red book investigation process

2    where the witnesses writes out what's being said, as

3    opposed to the interviewee, which is you, writing out,

4    which we have as Exhibit 5?

5        A.   Right.

6        Q.   If you look at the date at the top, it looks

7    like they did that on May 15th, 2013.  Does that refresh

8    your recollection that it was about that time period?

9        A.   I can agree with that.

10       Q.   So it was a good three weeks?

11       A.   Since, yes, because this would have been June

12   10th.

13       Q.   So when you sat and wrote your statement out on

14   June 10th, how were you recollecting what the

15   allegations were?

16       A.   Strictly by memory.

17       Q.   Did you keep any notes or anything of the

18   interview process that you went by?

19       A.   No, sir.  I just answered questions that they

20   asked.

21       Q.   And when you came back and sat down to write

22   this out on 6-10-13, you just wrote this out from your

23   memory based on what they asked?

24       A.   Yes.

25       Q.   Now, I know a second ago you said that, at the

CHERYL BOWDEN-WALKER

1    time you sat down to write this out, that it was

2    accurate.  Have you found out something since that time

3    that makes any statement in here inaccurate?

4        A.   Well, again, I wrote this statement based on

5    the questions that were asked to me that I recall.  The

6    only thing since is now I have heard audio recordings

7    that may substantiate some of the conversations.

8        Q.   And in particular, you state in here, "It was

9    alleged that I made or he overheard sexual comments that

10   I made about my significant other.  I do not recall

11   making any such statements."

12       Well, you know now that that's inaccurate?

13       A.   I know now that is inaccurate after hearing

14   that after being terminated.

15       Q.   And after hearing the audio recordings that

16   Mr. Copeland made?

17       A.   Yes, through my attorney.

18       Q.   Right, okay.  Now, in the first audio recording

19   that we're talking about, which is labeled folder B, to

20   me there wasn't much significance until we get to about

21   minute 42 -- I'm sorry, 51.  There's some language, but

22   around the 51 minute, 12 second mark, you can be heard

23   humming and singing a little tune.  Do you remember what

24   that tune is?

25       A.   Off the bat right now, I can't remember the

CHERYL BOWDEN-WALKER

Page 49

1   name of the tune.  But I did hear it, and I do -- I do

2   remember that tune.

3        Q.   Where were you and Mr. Copeland at that time?

4        A.   We were in the office.

5        Q.   Was it just y'all two?

6        A.   Based on me not hearing anyone else in the

7   audio recording, I can say on that particular one

8   because I have heard others and that one, but I didn't

9   hear anyone else.

10       Q.   And it sounds to me like you are working?  You

11  are performing some work?

12       A.   Yes.

13       Q.   What's he doing?

14       A.   Based on the dates -- See, we can't allow our

15  agents to go off, if they haven't finished the field.

16  And he probably was just sitting around and doing

17  paperwork or helping with papers pretty much.

18       Q.   As you sit here today, do you have a specific

19  recollection of that day?

20       A.   Of that day?  No.  But when I heard the

21  recording, I could probably remember it happening, but I

22  can't just put us on that day.

23       Q.   I know it was after Christmas because there's a

24  reference made to y'all having done something over

25  Christmas with freight, y'all handled freight a certain

CHERYL BOWDEN-WALKER

1    way or something, so it seems to me like it's in

2    January.  We don't have a date stamp on it.

3        A.    Right.

4        Q.    But would you agree that it's after Christmas

5    of December '12?

6        A.    I can say that it was after Christmas, uh-huh.

7        Q.    Now, in the song you were singing was a

8    reference to masturbation?

9        A.    I did hear that, yes.

10       Q.    Now, does that help refresh -- I mean, Nick and

11   I have talked about this, and Nick seems to think that

12   it's an actual song?

13       A.    It is a song.  It is.

14       Q.    Who is the artist, do you know?

15       A.    I want to say the artist's name is Tweet.  I

16   want to say that's what it is.

17       Q.    And that's around the 54 minute and 40 second

18   mark when I actually hear the word "masturbation,"

19   somewhere in that area.

20       A.    Right.

21       Q.    And then somewhere around the 55 minute and 5

22   second mark, Mr. Copeland says, "Does everything with

23   you have to be sexual related," and you respond, "Yes"?

24       A.    I did hear that on the recording.

25       Q.    And that was you, correct?

CHERYL BOWDEN-WALKER

Page 51

```
 1      A.    It was me.

 2      Q.    Now, around the 57 minute and 30 second mark --

 3  And we can go back and play any of these, if you want

 4  to, okay?  Because we have them here.  There's again a

 5  mention of, "I can pick out sex," and then you say

 6  something about being welcome or unwelcome.  Do you

 7  recollect hearing that?

 8      A.    You're saying being welcome or unwelcome in

 9  terms of --

10      Q.    I'm just saying in terms of what you were

11  asking him, you were asking him whether it was welcome

12  or unwelcome?

13      A.    I do remember that, yes.

14      Q.    And what did he respond?

15      A.    To my recollection, without hearing it at this

16  point, we kind of kept talking, but he was like, "Let's

17  keep it professional."

18      Q.    Right.  And he was using the term

19  "professional," right?

20      A.    Yes, he did use the term "professional."

21      Q.    And around the 59 minute and 25 second mark,

22  you then engaged with him in a conversation about a past

23  sexual harassment experience that you had while you

24  worked I believe for the YMCA?

25      A.    It wasn't with the YMCA.
```

CHERYL BOWDEN-WALKER

1    Q.    I'm sorry.  Who was it with?

2    A.    It was a company by the name of Builder's

3    Alternative.

4    Q.    And you mentioned to him in the tape that it

5    happened about 15 years ago; is that correct?

6    A.    That's correct.

7    Q.    And you conveyed to Mr. Copeland that there was

8    some "fucked up shit."  Do you remember that language?

9    A.    I do use profanity, so, yes.

10   Q.    And then you proceed to say that if someone

11   wanted to be with you, or some words to that effect,

12   they would have to have, "the biggest wallet"?

13   A.    I didn't say it in that -- I don't believe I

14   said it like that, but I did allude that they would have

15   to have money, yes; that they weren't within my pay

16   grade or something like that.

17   Q.    Because it would have to be someone who could

18   afford what you like to do?

19   A.    I can't allude to what I was saying at that --

20   what I meant by that, but I did make a statement.

21   Q.    And around the 62 minute and 54 second mark, do

22   you agree with me that you made the statement that "As

23   far as I'm concerned, a dick is a dime a dozen, and I

24   carry a dollar in my pocket"?

25   A.    I did make that statement.

CHERYL BOWDEN-WALKER

Page 53

1      Q.    And you made that statement to Mr. Copeland?

2      A.    I did.

3      Q.    Do you think that was appropriate language to

4   use in conversations to have with a subordinate?

5      A.    For a normal subordinate, I do not think.  But

6   Sean Copeland and I had some different ties.

7      Q.    What were those different ties?

8      A.    He was dating my sister.  Her name is Brandi

9   Caston.  B-r-a-n-d-i, C-a-s-t-o-n.  He was privileged to

10   know more about me than some of the others because we

11   have all ate out together with him, myself, Larry my

12   significant other, my sister, and then another one of

13   the APs met us out to eat.

14      Q.    Who was that?

15      A.    Gary Clemons.

16      Q.    Okay.

17      A.    And he asked me questions on other occasions

18   that are not recorded, you know, about my personal life

19   in terms of my boyfriend versus my husband.  Because he

20   had actually seen -- He's been out with my boyfriend,

21   but he saw my husband and I at the time shopping for

22   Christmas for the kids.

23      And once he saw that, he came to me with a lot of

24   questions about, you know, "What happened with you all?

25   You all seem like you get along," you know, and kind of

CHERYL BOWDEN-WALKER

1    2013.  It's hard to tell, I understand.  Did Sean

2    Copeland getting together with your sister, did that

3    occur prior to that or after that?

4        A.    It was prior.  And I would also like to state

5    that what you are referencing, that was the last

6    conversation that we had at that level because I am a

7    professional, and if someone says keep it professional,

8    I knew then that that that was time out for that and keep it

9    business.

10       Q.    So you believe this was the last -- of the two

11   recordings that I'm focusing on today, that one we just

12   talked about was the last one?

13       A.    Yes.

14            MR. CUPP:  Let's take a break.

15            (A short break was taken off the record at

16   12:22 p.m.)

17            (Deposition resumed on the record at

18   12:29 p.m.)

19   BY MR. CUPP:

20       Q.    We're back on the record after a five-minute

21   break.  Ms. Walker, I want to refer to another audio

22   recording that was provided.  And this is a second one

23   that's referred to as a recording from digital recorder

24   folder C.  I think the first one was folder B.

25       This one is a little bit over an hour-long

CHERYL BOWDEN-WALKER

Page 57

1   recording, and it starts off with you in what appears to

2   be some sort of training with a group of subordinate

3   employees; is that correct?

4       A.   I believe in that recording, it was myself,

5   Sean Copeland, and Joseph Brosure.

6       Q.   Do you recall if there was a third person in

7   there?

8       A.   From the recordings that I heard and just in my

9   memory's sake, because I do remember when Joseph was

10  trying to get a promotion and we were talking about it,

11  so I believe it was just the three of us then.

12      Q.   And in this one, these are some of the things

13  I've heard, and if you could confirm or deny it, and if

14  you can't remember we'll play it.

15      A.   Yes, sir.

16      Q.   But about the 7 minute and 5 second mark, you

17  are speaking to -- and, again, these are your

18  subordinate employees in there, correct?

19      A.   Yes.   I'm not sure if it was like that the

20  entire time, but ask the question.

21      Q.   Like what?   Subordinates?

22      A.   Yes, I don't know.   That's what I'm saying; ask

23  the question, and maybe I can tell you.

24      Q.   You are talking about some of the different

25  positions within the company, and you are making

CHERYL BOWDEN-WALKER

Page 58

1    reference that you don't want to be in your position for

2    too much longer, but you have to be there a year?

3        A.    Right.

4        Q.    And you are hoping to go into a co-manager's

5    position, rather than into an assistant manager's

6    position?

7        A.    Uh-huh.

8        Q.    And there's some discussion about that, and

9    then you make reference to the co-managers there, "The

10   bastards don't know what they're doing"?

11       A.    I made that statement.

12       Q.    You made that statement?

13       A.    Yes.

14       Q.    Who are you referring to there?

15       A.    Well, basically, and I can't say on the record

16   or off the record, but this was kind of when we were

17   kind of breaking and talking and referring to growing

18   with the company.  So it was just kind of me and the

19   guys were just talking about, you know, the company.

20       Now, per se, it wasn't anyone in particular, but

21   from what I was noticing with our co-managers, they

22   didn't have a clue because I was in asset protection and

23   they really didn't do a good job to do things to keep us

24   from having shrink.

25       Q.    And then at about the 17 minute and 10 second

CHERYL BOWDEN-WALKER

Page 59

1    mark, you told them a story, maybe, or about your prior

2    experience at the YMCA about setting an example for your

3    workers when you cleaned the bathroom?

4       A.   Yes, I did.

5       Q.   And you would admit that you used the word shit

6    quite often in that?

7       A.   Yes.

8       Q.   And then you proceed at about the 19 minute and

9    50 second mark to tell about a customer, a shoplifting

10   customer, who came in on the 4th of July?

11      A.   Correct.

12      Q.   Was that at 903?

13      A.   That was at 903, yes.

14      Q.   And that she was caught at the door, and then

15   she proceeded to --

16      A.   We'll use the word defecate on herself.  Yes.

17   Yes.

18      Q.   All right.  And in talking with the people

19   about that, you referred to the customer as "nasty ass"?

20      A.   I did.

21      Q.   "A big bitch"?

22      A.   I did.

23      Q.   "A dumb ass"?

24      A.   Okay, yes.

25      Q.   Did you refer to her as "a white bitch"?

LOGAN REPORTING
601-622-7622

CHERYL BOWDEN-WALKER

1      A.    I may have said it, but I don't -- and I

2    probably did say that.  And if I just may add, the

3    culture of our area in asset protection, profanity is

4    used.  I came into it in working with guys, and that was

5    kind of common.  And I had to kind of get with our lingo

6    early on, to even be successful in dealing with guys.

7    So I'm not the only person that uses profanity in that

8    area.

9         And I trained with it, and we have to do it because

10   our guys get cursed out and things, and you don't want

11   them to react with the customer.  So that was kind of

12   the culture in asset protection.

13      Q.    Did you experience that type of language when

14   you were going through training?

15      A.    Well, I've heard -- and, yes, we even --

16   Everybody uses profanity in our office, so, yes.

17      Q.    And you are talking about in asset protection?

18      A.    In asset protection, yes.

19      Q.    And then there is a reference at about 24

20   minutes and 26 seconds into it where one or two of the

21   guys -- And, again, it's all guys in there, right?

22      A.    It was myself and the two gentlemen, yes.

23      Q.    That they were going to go to the gym?

24      A.    I don't recall that piece right there, but go

25   ahead.

CHERYL BOWDEN-WALKER

1    Q.   All right.  And at about the 25 minute and 10

2    second mark, you refer to them as your young bucks?

3    A.   Okay.

4    Q.   Do you agree with that?

5    A.   Yes.

6    Q.   At about the 25 minute and 30 second mark, you

7    state to them, "I guarantee you, you have not been done

8    like I do, and that is the truth."

9    A.   I did hear that, and I'm not too sure exactly

10   what we were alluding to, but I did hear that on the

11   recording.

12   Q.   Well, are you denying that it was a sexual

13   reference?

14   A.   I'm not certain.  I'm not certain.

15   Q.   When you made the "young buck" reference, did

16   you say that, "I'm going to be teaching you something,

17   young buck"?

18   A.   Yes, I remember that from the recording being

19   said, but that does not necessarily allude to something

20   sexual because in that I know I was talking to them

21   about what course to go educationally as well as within

22   the company.  We were just talking about stuff kind of

23   off the record on a break.

24   Q.   But you admit that's you, right?

25   A.   I do admit it was said, yes.

CHERYL BOWDEN-WALKER

Page 62

1    Q.   About the 25 minute and 50 second mark, you

2    convey or tell a story about Larry, about having some

3    issues with Larry because you were still married to your

4    husband?

5    A.   Okay, that would have been a different time

6    frame because Joseph would not have been in there during

7    that.  That would have just been me and Copeland.

8    Q.   Well, this is one I think we're going to have

9    to listen to.

10   A.   That's fine, if you would like to listen to it.

11   Q.   Yes because in this one I did catch that it was

12   done twice.

13   A.   And that's what I was kind of trying to see how

14   it flowed.

15   Q.   Okay, and we'll go off the record while I set

16   this up, and we'll listen to it off the record.

17        (A short break was taken off the record at

18   12:38 p.m.)

19        (Deposition resumed on the record at

20   12:40 p.m.)

21   BY MR. CUPP:

22   Q.   We took a break for a second while I queued the

23   recording.  I'm going to start it at the 24 minute mark.

24   A.   Okay.

25   Q.   I want to play it through the 28 and a half

CHERYL BOWDEN-WALKER

Page 63

1  minute mark.  It's going to be four and a half minutes,

2  and I know that's a long time to sit here.

3      A.    That's fine.

4      Q.    I think we'll take a break because we don't

5  have to be on the record for this.

6      A.    That's fine.

7          (A short break was taken off the record at

8  12:41 p.m.)

9          (Deposition resumed on the record at

10  12:44 p.m.)

11  BY MR. CUPP:

12      Q.    I said I was going to play it through 28 and a

13  half minutes, and I stopped it at 27:38 on the

14  recording.

15      A.    Right.

16      Q.    And I was asking you before we listened to the

17  tape whether you were conveying the story about Larry in

18  front of several of the --

19      A.    It was the two.

20      Q.    And earlier you testified that you thought it

21  was only to Sean, but you now see that it was --

22      A.    It was.  It was the two.

23      Q.    Okay.  Now, you also heard your comments that,

24  "I guarantee you, you have not been done like I do."

25  You heard that comment on there?

CHERYL BOWDEN-WALKER

1       A.    I did.

2       Q.    And having heard that, were you referring to

3   something of a sexual nature?

4       A.    I'm still not going to say it was sexual on

5   that one, but I do say that I did make the statement

6   about Larry.

7       Q.    And when you made the statement about Larry,

8   you reference you and Larry laying in bed buck naked?

9       A.    I did hear that, yes.

10      Q.    Right before I stopped it at 27:38, I cannot

11  make it out totally, but it seems to me that you say --

12  you are speaking sort of softly, and you say something

13  about "wrapping it around this here," and then there's a

14  chuckle from the guys.  Do you remember what you said?

15      A.    I do not.  I do not.

16      Q.    All right.  We can go off the record, and I'm

17  going to play it from 27:38 for about the next minute

18  and a half.

19           (A short break was taken off the record at

20  12:46 p.m.)

21           (Deposition resumed on the record at

22  12:47 p.m.)

23  BY MR. CUPP:

24      Q.    I've stopped the recording at 28:48, and I just

25  heard a comment about you "having a serious conversation

CHERYL BOWDEN-WALKER

1   with you guys" with emphasis on the word "serious"?

2       A.   Yes.

3       Q.   And you also talked about "stimulation of your

4   mind."  Do you recall what the context of that was?

5       A.   The only thing I can say just based on what

6   I've heard is that we were talking, and there have been

7   other sidebars where he has asked about me liking him.

8   But I told him, you know, he's a smart guy and he could

9   -- because he's a smart guy, he could stimulate my

10  intellect but nothing more because I wasn't interested

11  in his type of build or anything like that.  So, you

12  know, we did have that conversation.

13      Q.   But would you agree with me that what you just

14  heard about this serious conversation with young guys

15  with the emphasis on "serious" was in the room with both

16  of the gentlemen?

17      A.   Yes.

18      Q.   Do you recall that later on, on this recording,

19  that the meeting breaks up, and you go back to the

20  office with Sean?

21      A.   Yes.

22      Q.   And there you have -- Again, you get into your

23  relationship with Larry and your husband?  Do you recall

24  that?

25      A.   Not off the bat, but you can go ahead and ask

CHERYL BOWDEN-WALKER

Page 66

1  the question.  I'll probably remember it by your

2  question.

3      Q.  Well, let's listen to it here.  This is going

4  better than I thought.  We're going to go off the

5  record, but I'm going to play this from the 30 minute

6  and 47 second mark, and then I'll put a notation on the

7  record when we stop.

8      A.  That's fine.

9          (A short break was taken off the record at

10  12:49 p.m.)

11         (Deposition resumed on the record at

12  12:53 p.m.)

13  BY MR. CUPP:

14     Q.  We've just listened to the 34 minute and 5

15  second mark of this particular recording, and you were

16  just getting ready to get into a conversation about your

17  friend?

18     A.  Yes.

19     Q.  I think you said Taneka (phonetic)?

20     A.  Taneka.

21     Q.  Taneka, okay.  But prior to that, you had the

22  conversation with Sean about your relationship with

23  Larry?

24     A.  Uh-huh.

25     Q.  Does that refresh your recollection that that

CHERYL BOWDEN-WALKER

1    occurred?

2        A.    It does, yes.

3        Q.    And is it your testimony from earlier that

4    y'all had had other conversations --

5        A.    Yes.

6        Q.    -- about this same topic that weren't recorded?

7        A.    Yes, because he came to me, and a lot of this

8    was just kind of probing.  Like I hear the probing,

9    "Well, what did he say," and that kind of stuff to keep

10   the conversation going.

11       And, actually, just to put a point of reference on

12   this, this was while he was still in training and

13   couldn't go out on the floor.  And it was before the

14   January 15th, which would be in folder 1, because folder

15   1 was the last one where he was actually released to

16   work.  And so this was prior even to that conversation

17   about even keeping things professional.

18       But going back to that day, we have had

19   conversations because he would come to me and ask, so

20   like I said earlier, you know, "Why aren't you with your

21   husband?  Y'all look like y'all are good together.

22   Larry seems like he doesn't have any ambition."

23       It would be little conversations that he would ask

24   because he actually went out with Larry and I, and he

25   saw him.  And he actually met my husband at the time

CHERYL BOWDEN-WALKER

1   when we were out on the sales floor purchasing stuff for

2   Christmas.

3       But like I said, yes, the conversations happened.

4   And even to address the one with Joseph, Joseph was kind

5   of like a little brother.  And he came to me, and I

6   think he even said in that, you know, "Well, answer this

7   as a friend, as my friend let's do that."  So we kind of

8   had a relationship too, kind of, that we could be more

9   candid.  So that's why he would have been in the room.

10     Q.   But later as this proceeds, you tell a story

11   about Taneka?

12     A.   Yes.

13     Q.   And I think you go into a --

14     A.   The drinking thing.  I remember.

15     Q.   But before you go into the drinking thing, you

16   talk about going to Pizza Inn, and the kids were doing

17   some sort of project?

18     A.   Yes, I remember that.

19     Q.   But do you recall the conversation?

20     A.   I do recall that conversation, yes.

21     Q.   And do you recall - and this appears at about

22   the 43:10 mark - telling Sean that on New Year's Day,

23   you and Larry woke up buck ass naked in the bed?

24     A.   Yes, I did.

25     Q.   In the recording that you made on December 23rd

CHERYL BOWDEN-WALKER

1      Q.   So you had some notations on it?

2      A.   Correct.

3           MR. CUPP:  And, Nick, of course, all of this

4   has been produced.  I just don't have the Bates numbered

5   copies, but y'all have them all.

6   BY MR. CUPP:

7      Q.   Okay, so this was initially denied?

8      A.   Yes.

9      Q.   What did you do after receiving this denial

10  letter?

11     A.   I followed their instructions for

12  reconsideration, so I submitted the same day a

13  reconsideration.  Because when they faxed me this, they

14  also attached what the work requirements are for an

15  assistant manager.

16      And so when I looked here and they said that, "An

17  assistant manager is required to move, lift, carry, and

18  place merchandise weighing up to 25 pounds without

19  assistance, your restrictions of limited bending,

20  kneeling, and squatting to when adequate support is

21  available to assist with stability, as well as

22  standing/walking 10 minutes out of every hour prevents

23  you from performing the essential functions of your job,

24  either with or without a reasonable accommodation;

25  therefore, you cannot return to your position at this

CHERYL BOWDEN-WALKER

Page 82

1    time."

2         I just want to go further to say where they said

3    something about that was my essential job duties.  So

4    when I saw that, I'm like, "That's not an essential job

5    duty."  So I actually took the -- the -- what do you

6    call it?

7         Q.   Job description?

8         A.   The job description, thank you, for an

9    assistant manager, and I wrote a statement attached to

10   it showing that that is not an essential function of my

11   job.  And I asked for -- and then I kind of -- I was

12   trying to guide them on, "Hey, we can help her."  I'm

13   like, "We have carts in the store," and I put that in

14   the statement.

15        Q.   And I think you had mentioned something that

16   this initial letter that you are referring to it was a

17   physical activity but not an essential function?

18        A.   Correct.

19        Q.   All right.  So --

20        A.   But my scooter would allow me to still do this,

21   this one physical activity.

22        Q.   So you then sent in a request for

23   reconsideration?

24        A.   Correct.

25        Q.   Which I'm putting in front of you and marking

CHERYL BOWDEN-WALKER

Page 83

1    as Deposition Exhibit 11.

2            (Exhibit 11 marked for identification.)

3        A.   Yes.

4    BY MR. CUPP:

5        Q.   And then on the second page of this exhibit,

6    you explain why you believe they are wrong?

7        A.   Yes.

8        Q.   I don't attach the job description on this

9    exhibit, but I know what you are referencing.

10       A.   Yes, sir.

11       Q.   And that's your note at the bottom to the EEOC

12   agent?

13       A.   Yes.

14       Q.   And you explain to the EEOC why you sent this

15   in; because you felt they had your essential job

16   functions wrong?

17       A.   Correct.

18       Q.   All right.  And to your knowledge, this was not

19   being decided at the store level; is that correct?

20       A.   No, not at the store level.  They actually have

21   a department, an accommodations department, that makes

22   this determination.

23       Q.   It's out of Bentonville?

24       A.   Yes.

25       Q.   And that's Exhibit 11?

CHERYL BOWDEN-WALKER

Page 84

1      A.    Right.

2      Q.    And then without coming right out and saying

3  you were right, they sent you a letter granting you an

4  accommodation?

5      A.    The next day, yes.

6      Q.    And we're going to mark that as Deposition

7  Exhibit 12.

8           (Exhibit 12 marked for identification.)

9  BY MR. CUPP:

10     Q.    Is that the letter you received?

11     A.    Well, I didn't receive it.  The store received

12 it, and they faxed it to me.  And they faxed it on the

13 18th, which was the next day, the day right before I

14 came back to work.

15     Q.    I see.  Now, the accommodation that was granted

16 for you was a Shoprider Start 3 Portable Scooter?

17     A.    Uh-huh.

18     Q.    That's different than the carts that we see the

19 customers in?

20     A.    It is different from that, yes; however, I've

21 never seen one, so I don't know what it looks like.  But

22 they say they have it.

23     Q.    I guess the point I wanted to clarify is that

24 this was different from the customer carts?

25     A.    Yes, sir.

CHERYL BOWDEN-WALKER

1   I have my papers; he wanted to send it to Melody Ezell,

2   even though we have kind of been going back and forth

3   all the while.

4       But I told him I did, and he faxed the same

5   paperwork that I had that showed my accommodation and

6   this letter.  At that time, he faxed it again to

7   Ms. Ezell.

8       Q.   Do you know if Luke as a store manager had ever

9   in the past had the occasion to have an associate ask

10  for a scooter like you asked for?

11      A.   I don't know, but I can assume that because he

12  told me I was treading uncharted waters that this would

13  have been the first.

14      Q.   Well, that's what I was wondering too.  I don't

15  know is it -- In the way he told you about it, was he

16  saying, "Look, this is uncharted waters for me too here

17  because I haven't had this type of request before"?

18      A.   I didn't take it that way because that -- it

19  was more so because he said that backed up behind the

20  morale issue deal.  And when somebody says you are

21  treading uncharted waters, I take that as saying that's

22  somewhere that we've never gone before.  But you can

23  also see it, when you mix that with the morale of other

24  employees, you know, as if you're doing something that's

25  not the norm.

CHERYL BOWDEN-WALKER

Page 88

1       Q.    So it's your testimony he said those two things

2    in the same --

3       A.    He said those two things, yes.

4       Q.    In the same conversation?

5       A.    Yes.

6       Q.    Back to back in the conversation?

7       A.    Yes, when we met and I told him I was hurting.

8       Q.    On the 19th?

9       A.    No, this was the 20th with that conversation.

10      Q.    That conversation of uncharted waters and

11   morale, those are the three words that came up on --

12      A.    The statement, yes.  And what I did was --

13      Q.    -- on the 20th?

14      A.    On the 20th, yes.  And what I did is, when I

15   went to communicate with Regina Barnes what was going

16   on, I actually put a statement to the fact that that

17   took place.  And that's in an email to Regina Barnes.

18      Q.    I don't think I've seen that.  Did you include

19   that in the statement to the EEOC?

20      A.    It should have been.

21      Q.    Why don't you give me a date?

22      A.    I'll be happy to.  It's right here.  I sent the

23   email to her on Friday, December 20th, at 3:22 p.m.  She

24   responded at 9:20 p.m. on December 20th.

25      Q.    And these are documents you gave to the EEOC?

CHERYL BOWDEN-WALKER

Page 89

1      A.   I should have.  I've given everybody the same,

2   EEOC as well as my attorney.

3      Q.   Okay, why don't you bear with me and let me see

4   if I can find it here.

5      A.   No problem.

6      Q.   We're going to mark that email as Exhibit 14,

7   okay, Ms. Walker?

8      A.   Yes, sir.

9           (Exhibit 14 marked for identification.)

10  BY MR. CUPP:

11     Q.   Since you have that one right there, why don't

12  you refer to that one?

13     A.   Okay.

14     Q.   And I'll put this in the stack of exhibits in a

15  second.

16     A.   No problem.

17     Q.   So you sent the email on December 20th, which

18  is that Friday, at 2:06?

19     A.   I sent it at 3:22.

20     Q.   Oh, I see.  You initially sent it, and

21  apparently it bounced back to you.

22     A.   Okay.

23     Q.   And then you resent it at 3:22, all right.

24     A.   That's correct, 2:06 was the original, yes.

25     Q.   What time did you go into work on December

CHERYL BOWDEN-WALKER

Page 90

1    20th?

2        A.    That would have been -- On here it says 8:00 to

3    6:00, so it would have been 8:00 a.m. is when I went in.

4    And I stayed until about 10:00 p.m. that night,

5    according to the email.  So I was supposed to get off at

6    6:00, and I stayed until 10:00.

7        Q.    I'm sorry, let me back up on that, okay?

8        A.    Okay.

9        Q.    In this email to Regina, you are talking about

10   the events that transpired on the 19th and 20th?

11       A.    The 19th and 20th, yes.

12       Q.    Right.

13       A.    And I kind of broke it down for the 19th, and I

14   had made a statement, and then I said the 20th, yes,

15   sir.

16       Q.    So you returned to work at 8:00 a.m. on the

17   20th?

18       A.    Yes.

19       Q.    I thought you just told me that the reference

20   to uncharted waters and the morale problem were set

21   forth in this email?

22       A.    I'm looking now.  I thought I did say that.

23   Hold on.  And, actually, where that is referenced, now

24   that I see it's not there -- and it happened probably

25   when everything was going on, I wasn't thinking about it

CHERYL BOWDEN-WALKER

1    at the time.  But when I actually went and found my

2    claim, if you want -- and you should have a copy of this

3    too.  I put it in that.

4        Q.    I do.  And we're going to get into that.  So

5    just so we're clear, on December 20th when the events

6    were happening, you sent this email to Regina Barnes,

7    but you don't mention the phrase uncharted waters?

8        A.    I don't mention that phrase at that time, no.

9        Q.    And you don't mention that Luke had said

10   something about it being a morale problem?

11       A.    Not in this email.

12       Q.    All right.  I want to give you Exhibit 14 to

13   put in that stack right there.

14       A.    Okay, thank you.

15             (Exhibit 15 marked for identification.)

16   BY MR. CUPP:

17       Q.    This next exhibit is Exhibit 15.  This is your

18   statement to the EEOC?

19       A.    Correct.

20       Q.    Is that the same one you have over there in

21   your stuff?

22       A.    No.

23       Q.    Well, it's --

24       A.    That's what I'm trying to see, how this

25   happened or whatever, because this is one that wasn't

CHERYL BOWDEN-WALKER

Page 92

1    dated.  They are different.

2        Q.    They are different?

3        A.    Yes.  And that's what I'm trying to see is how

4    could that be, which maybe why I had this original.

5              MR. CUPP:  Nick, did you want to see this?

6              MR. NORRIS:  I've seen it.

7              MR. CUPP:  You've seen it?  Do you know what

8    the difference is?

9        A.    Because I see it's not dated.  I'm looking.  It

10   may be that I had started writing it and rewrote it

11   there.  But I still mention that in their statement,

12   though, a little different.

13   BY MR. CUPP:

14       Q.    It looks like the EEOC is the -- it looks like

15   this is a maybe draft version of it?

16       A.    Because that's like the original intake, I

17   think.

18       Q.    Okay, we're going to include Exhibit 15 as the

19   official -- That's your official statement that went to

20   the EEOC file?

21       A.    Right.

22       Q.    All right.  So we're going to include as

23   Exhibit 15 as the official -- your official statement

24   that went into the EEOC file.

25       A.    Okay.

CHERYL BOWDEN-WALKER

Page 96

1   use that cart.  And then here you are Monday saying it's

2   okay."

3        Q.   So Monday, at least the first part of that

4   conversation about the cart, that was resolved to your

5   satisfaction?

6        A.   It was.

7        Q.   All right.  Do you possess any knowledge that

8   Luke had any input into the decision to discharge you?

9        A.   I wouldn't know because, when I was called

10  back, I was terminated and turned in keys, and that was

11  it.

12       Q.   Who informed you that you were terminated?

13       A.   I was called back by Ms. Regina, and she asked

14  me could I come back into the store that day.  And I

15  came back on the afternoon side because I went to get my

16  hair done.  And so when I got done getting my hair done,

17  I went there.  And at that time, she said based on their

18  investigation that they were terminating me.

19       Q.   Did you record that conversation?

20       A.   No.  And I asked, but she told me that she

21  didn't want her voice on anything.

22       Q.   Oh, you asked to record it?

23       A.   I asked at that time, yes, because I really

24  wanted to see if they wanted to go on record saying

25  that, with me not being able to put on a case or

CHERYL BOWDEN-WALKER

Page 97

1    anything.

2         Q.   And just so we're clear, the case that you

3    believe you would have been able to put on would have

4    been to better explain the relationship that you had

5    with Mr. Copeland?

6         A.   Correct, as well as I could have added that

7    after he said to keep things professional, there was

8    nothing else.  He had no other recordings after that, so

9    which means that I complied.

10        Q.   All right.  Other than the statement from Luke

11   about uncharted waters and morale, did any other Walmart

12   manager use language such as that to you?

13        A.   No.

14        Q.   Did any associate say anything to you?

15        A.   No.  We had no type of communication about

16   that.  It was just a normal workday again.

17        Q.   And, again, I don't want you to repeat what

18   Luke told you, and I may be repeating my question, but I

19   just need to make sure.  Was there any other Walmart

20   manager who you will testify said something that you

21   believe was inappropriate regarding your accommodation

22   request?

23        A.   No.  The only thing, like I said, was Luke's

24   statement to me.  And that's, again, in hindsight after

25   everything had happened, it kind of led me to believe

CHERYL BOWDEN-WALKER

1     that they were going toward looking for a reason to

2     terminate me and to prevent me from being able to use a

3     scooter.

4          And then the fact that Regina Hosey, you know, made

5     me go home when they could have allowed me to do another

6     duty.  Those were the two things that I felt like they

7     did against me.

8          Q.   I understand.  And you were concerned about

9     going home because you were concerned, in part, that you

10    weren't going to get paid?

11         A.   Correct.

12         Q.   But they did pay you?

13         A.   They did at the end, yes.

14         Q.   All right.  I want to take a few minutes -- and

15    we're going to mark this as Exhibit 17.

16              (Exhibit 17 marked for identification.)

17    BY MR. CUPP:

18         Q.   These are your responses to the interrogatories

19    that we sent.  All I'm going to ask you to do -- I don't

20    think I'm going to ask you about anything in here, but

21    I'll look to see while you are reviewing them.  But I

22    just need you to read through them and acknowledge to me

23    whether they are accurate, true, and correct, or whether

24    there's anything in here that needs to be changed, okay?

25         A.   Okay.

CHERYL BOWDEN-WALKER

Page 105

1     work take place.

2          Q.   So as you sit here today, you're telling me

3     that you would have preferred to have been called in

4     earlier to discuss these red book allegations?

5          A.   I'm not saying what a preference date is.  I'm

6     saying that if they knew ahead of time that they wanted

7     to deal with that, then they would have brought me in,

8     if they didn't have my accommodations in place, before

9     putting me on the floor to work.

10         Q.   Is it accurate to say, Ms. Walker, that with

11    respect to the communications that were going on between

12    you and Regina Barnes or Regina Hosey while you were on

13    leave regarding that time off policy, that was initiated

14    by you?  The inquiries were initiated by you?

15         A.   The inquiry was initiated by me.  And, yes, she

16    did respond.  But if she can make the same comment on

17    the day that she met that she wanted to wait, she could

18    have even just said, "We'll talk about it when you

19    return."

20         Q.   But just to be clear, the company

21    representatives were responding to your questions about

22    the paid time off policy because you were asking them

23    questions about that?

24         A.   That's correct.

25         Q.   All right.  Now, the last exhibit I think is

CHERYL BOWDEN-WALKER

Page 112

1            CERTIFICATE OF COURT REPORTER

2            I, BECKY LYNN LOGAN, Court Reporter and Notary

3    Public, in and for the County of Rankin, State of

4    Mississippi, do hereby certify:

5            That on the 21st day of October, 2015, there

6    appeared before me CHERYL BOWDEN-WALKER;

7            That the witness was sworn by me to tell the

8    truth, the whole truth, and nothing but the truth in

9    said cause;

10           That the foregoing pages contain a full, true,

11   and correct transcription of all testimony of said

12   witness as taken by me at the time and place heretofore

13   stated;

14           That I am not of kin or in anywise associated

15   with any of the parties to said cause of action or their

16   counsel, and that I am not financially interested in the

17   action.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19   and seal, this the 29th day of October, 2015.

20

21           _____
             BECKY LYNN LOGAN, RPR, CCR #1750

22

23

24   MY COMMISSION EXPIRES:  November 28th, 2017

25